**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| NANCY MEYER, <br> Plaintiff, <br><br> v. <br><br> F.I.A. CARD SERVICES, N.A., <br> Defendant. | Civil No. 09-2726 (JRT/SER) <br><br> **MEMORANDUM OPINION AND ORDER DENYING SUMMARY JUDGMENT** |

Trista M. Roy, **CONSUMER JUSTICE CENTER, P.A.**, 367 Commerce Court, Vadnais Heights, MN 55127, for plaintiff.

Katherine E. Licup, **FOLEY & LARDNER LLP**, 321 North Clark Street, Suite 2800, Chicago, IL 60654; Christi R. Adams, **FOLEY & LARDNER LLP**, 111 North Orange Avenue, Suite 1800, Orlando, FL 32801; Michael A. Klutho, **BASSFORD REMELE, PA**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for defendant.

Nancy Meyer was the victim of fraud when her live-in fiancé stole convenience checks from two of her credit cards and forged her signature to cash those checks. The question presented in this motion is whether defendant F.I.A. Card Services, N.A. ("FIA") has shown its investigation into that fraud was reasonable such that, as a matter of law, it met its obligations under the Fair Credit Reporting Act when Meyer alerted it to the fraud. Since FIA knew the nature of the fraud and had specific requests from credit reporting agencies ("CRAs") to verify the signatures on the checks, which it did not do, the Court finds that FIA has not made such a showing and denies FIA's motion for summary judgment.

## BACKGROUND

Nancy Meyer owned three FIA credit cards, two of which were fraudulently used by her then-fiancé, Jason Clark. Opened in 2000 and 2003, Meyer had not used the accounts in several years when Clark charged over $12,000 on each card. Clark would intercept the checks at their shared home, write them out for cash, sign Meyer's name, and deposit them into her Wells Fargo checking account. (Aff. of Katherine Licup, June 30, 2010, Ex. A at 20–22, Docket No. 26.) She claims he would then request money from her to pay his bills and pretend the deposits were from his paycheck or from gambling. (*Id*., Ex. A at 29.)

In an attempt to cover up his fraud, Clark would ask for checks in certain amounts from Meyer to pay contractors for a business he was allegedly starting. (*Id.*, Ex. A at 85–87.) Clark would fill in the "pay to the order" line himself and then would use those checks to make payment on the FIA accounts. (*Id.*) Meyer never looked at the checks after they were cashed to verify where the money was going. (*Id.*) Meyer learned of the charges in June 2008 when FIA called her to inquire about the past-due status of the two accounts. (*Id.*, Ex. A at 18.) Meyer told the caller they must be mistaken since she did not think the accounts were active. (*Id.*) Meyer requested copies of statements and other history on the accounts. (*Id.*) From this evidence, Meyer learned of Clark's actions.

In September, Meyer made one payment towards one of the accounts in an attempt to keep her credit intact. (*Id.*, Ex. A at 19.) Meyer ended the relationship and Clark moved out in September after she discovered that he was a convicted felon and had

engaged in this type of conduct previously with others. (*Id.*, Ex. A at 25.) At that time, she contacted FIA and informed them she was the victim of fraud. (*Id.*, Ex. A at 25–26.) The parties dispute whether Meyer informed FIA of the fact that the checks had been deposited in her Wells Fargo account although FIA's notes from the telephone conversations make no mention of that fact. (*Id.*, Ex. 1 of Ex. C.) On September 29, 2008, after only a few telephone conversations with Meyer, FIA denied her claim of fraud on the basis that the checks had been deposited into her own account, therefore she presumably had paid her own bills with the proceeds. (*Id.*, Ex. 2 of Ex. A.) Meyer asked to speak to a manager about this determination and claims that the manager called her a liar, laughed at her, and hung up. (*Id.*, Ex. A at 93:9-25; Aff. of Trista M. Roy, Aug. 20, 2010, Ex. 2 at 94, Docket No. 29.) Meyer filed a police report with the City of St. Paul who requested a fraud affidavit to begin to investigate the claim. (Am. Compl. ¶ 10, Docket No. 2.)

FIA began reporting the accounts to the major CRAs as delinquent. On February 24, 2009, Meyer sent a letter disputing the accounts, naming Clark as the perpetrator of a fraud. She referenced the St. Paul police report number. (*Id.*, Ex 1.) Meyer sent a copy of this letter to FIA. (*Id.* ¶ 15.) FIA subsequently marked the accounts as "in dispute," checked Meyer's identity information against the account information, and called Wells Fargo to verify that the convenience checks had been deposited in Meyer's account. FIA again classified Meyer's clam as not fraud and reported this to the credit agencies in March 2009. (Licup Aff., Ex. B at 25–26, Docket

No. 26.) These actions were all that FIA's internal procedures required in the case of such a dispute. (*Id.*)

Meyer sent a second dispute letter to the CRAs and to FIA on June 16, 2009. (Am. Compl., Ex. 3, Docket No. 2.) The CRAs requested that FIA check the signatures on the checks for possible forgery. (Licup Aff., Ex. E, FIA-MEYER000015, Docket No. 26.) However, FIA followed the same procedure as it had previously, which was to verify the identity of Meyer relative to the account, review the fraud claim to see that it had been previously sent to the fraud department, mark the accounts as "in dispute," and report the earlier determination that the debt was not the result of fraud. (Pl.'s Mem. in Opp'n at 9, Docket No. 28.) It did not conduct any further investigation into Meyer's allegations of fraud and it did not compare the signatures as requested.

Meyer's filed her complaint in October 2009, alleging FIA violated the Fair Credit Reporting Act by failing to conduct a reasonable investigation of her fraud claim when she reported her accounts delinquent. She seeks actual and punitive damages. To overcome FIA's motion for summary judgment, Meyer "must present evidence that [FIA] failed to [conduct a reasonable investigation and] must . . . present evidence of harm and causation, or willfulness entitling [her] to statutory or punitive damages." *Reed v. Experian Info. Solutions, Inc.*, 321 F. Supp. 2d 1109, 1114 (D. Minn. 2004).

# DISCUSSION

## I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. FAIR CREDIT REPORTING ACT

### A. Reasonable Investigation

Section 1681s-2(b) of the Fair Credit Reporting Act "describes the duties of any entity which provides information to a Credit Reporting Agency when such entity is notified of a dispute regarding the completeness or accuracy of the furnished information." *Johnson v. United States Dept. of Defense,* No. 99-1699, 2000 WL 33956225, at *3 (D. Minn. Oct. 17, 2000); 15 U.S.C. § 1681s-2(b). Pursuant to § 1681s-2, once FIA received notice of Meyer's dispute from a CRA, it was required to "conduct a reasonable investigation of [its] records to determine whether the disputed information [could] be verified." *Johnson v. MBNA Am. Bank, N.A.*, 357 F.3d 426, 431 (4th Cir.

2004); *Malm v. Household Bank,* No. 03-4340, 2004 WL 1559370, at *4 (D. Minn. July 7, 2004). Moreover, such an investigation "require[d] some degree of careful inquiry by creditors." *Johnson,* 357 F.3d at 430. "[T]he reasonableness of an investigation depends on the facts of the particular case, **most importantly the CRA's description of the dispute in its notice**." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1160 (9th Cir. 2009) (citing *Johnson*, 357 F.3d at 429) (emphasis added).

Meyer presents evidence that she notified FIA of potential fraud on her account when she called FIA in June and September of 2008. She notified FIA of a potential fraud when she sent dispute letters in March and June of 2009. Further, the CRAs notified FIA that fraud was alleged in their requests for information in response to Meyer's complaints. Despite clear notice of fraud, FIA conducted its standard investigation which consisted of noting the accounts were in dispute, verifying Meyer's identify information in comparison to the account information, and looking to see that the fraud claim had been denied. FIA never attempted to talk to Clark, the St. Paul police department, or compare the signatures on the checks. The only step that FIA took beyond its standard response was to call Wells Fargo to verify that the convenience checks had been deposited in Meyer's account, not an issue in dispute.

Generally, questions regarding the reasonableness of an investigation are best for a jury to determine. *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995). In cases where fraud is alleged, however, a defendant's reliance on standard procedures calls into question the reasonableness of a cursory review. *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005) (finding summary judgment

appropriate when the reporting agency simply "verified [the plaintiff's] name, address, and date of birth and sent the [dispute] back to [the CRA. However, had the CRA] **given [defendant] notice that the nature of the dispute concerned fraud**, then perhaps a more thorough investigation would have been warranted." (emphasis added)). Therefore, in addition to a general presumption that the reasonableness of an investigation is a question of fact for a jury, when the reporting agency has knowledge of fraud and relies on cursory, standard procedures, a determination of reasonableness is even less appropriate at the summary judgment stage. *See, e.g., Howard v. Wells Fargo Fin. Acceptance*, No. C-07-5881, 2008 WL 5115049, at *3 (N.D. Cal. Dec. 04, 2008) ("While this case is like *Westra* in many respects, in contrast to *Westra,* the first [notice] sent to Defendants in this case did refer to fraudulent charges made on Plaintiff's account. . . . Therefore . . . Plaintiff has at least raised a triable issue of fact as to whether the investigation was reasonable.") As to the June reinvestigation after the initial determination that the claim was not fraud, only where "no reasonable reinvestigation . . . could have uncovered [the] inaccuracy . . ." is summary judgment appropriate. *DeAndrade v. Trans Union, LLC*, 523 F.3d 61, 68 (1st Cir. 2008) (citation omitted).

Here, FIA does not dispute that there were forged convenience checks, and it is unclear if an investigation that included a comparison of the signature on file for the account and those on the checks would have uncovered the inaccuracy at the time the CRAs requested this action be taken. The reasoning in *Bruce v. First U.S.A. Bank, N.A.*, 103 F. Supp. 2d 1135 (E.D. Mo. 2000) is apposite to this case. In *Bruce*, the court considered an investigation into fraud committed by the plaintiff's wife in which the

reporting agency knew that the signatures on the account documents did not match plaintiff's, yet it did not factor that into the determination of the accuracy of his claim of fraud. *Id.* at 1143. The court determined that the claim should survive a motion for summary judgment since a jury could find this unreasonable. *Id.* at 1144. Here, FIA did not check for forgery, despite clear evidence that it had notice of fraud, the nature of the fraud, and specific requests from the CRAs to check for forgery. A jury could find this unreasonable and as a result, the Court finds summary judgment is not warranted.

### B. Actual Damages

FIA moves for summary judgment on the grounds that Meyer cannot demonstrate actual damages. It points to the fact that the convenience checks were deposited in her own account, over which she had full control. Meyer responds that emotional distress under the FRCA constitutes damages. The only evidence of emotional distress to support her claim is her testimony as to her mental anguish.

Courts of Appeals are split on whether the term "actual damages" can include mental anguish. *Doe v. Chao*, 540 U.S. 614, 627 n.12 (2004) ("The Courts of Appeals are divided on the precise definition of actual damages." (citations omitted)). The Eighth Circuit has not directly addressed the question. Most courts within the Eighth Circuit have found that emotional distress qualifies as actual damages. *See, e.g.*, *Edeh v. Midland Credit Mgmt., Inc.*, No. 09-1706, 2010 WL 3893604, at *10 (D. Minn. 2010); *McKinley v. CSC Credit Servs., Inc.*, No. 05-2340, 2007 WL 1412555, at *5 (D. Minn. 2007); *Zean v. Unifund CCR Partners*, No. 08-1091, 2009 WL 2461723, at *2–3

(D. Minn. Aug. 10, 2009) ("Relief under the FCRA may also include out-of-pocket damages for emotional distress, even when no out-of-pocket damages have been sustained." (citing *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829, 834 (8th Cir. 1976) (holding that rule providing no recovery for "mere mental pain and anxiety" is inapplicable in FCRA actions) and *Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998) (holding plaintiffs could recover for emotional distress suffered when their credit reports were unlawfully obtained and their privacy violated based upon testimony regarding how they felt as a result of these acts))).

However, courts are divided on whether the testimony of the plaintiff alone suffices at the summary judgment stage. *Compare Edeh*, 2010 WL 3893604, at *10 ("Moreover, emotional distress is, by its nature, extremely subjective, and often the only evidence of emotional distress will be the testimony of the distressed person.") *with McKinley*, 2007 WL 1412555, at *5 ("[T]he Supreme Court held that an emotional injury constitutes 'injury' . . . only if it would be compensable under the terms of the zone of danger test. [T]he zone of danger test limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct." (internal citations and quotation marks omitted)). In *McKinley*, the court found that the testimony of the plaintiff with affidavits from family and friends as to his "anger, frustration, loss of sleep, and distraction allegedly caused by his credit dispute" were insufficient as a matter of law to survive summary judgment on the issue of actual damages. 2007 WL 1412555, at *5.

Some courts have utilized a middle ground at the summary judgment stage, "requiring that, when a plaintiff's testimony is the only evidence of emotional damages, the plaintiff must sufficiently explain the circumstances surrounding his or her emotional injury and may not rely on conclusory statements." *Zean*, 2009 WL 2461723, at *2–3.

Here, Meyer has presented no evidence of physical injury under the "zone of danger test" – even less evidence than the plaintiff in *McKinley* who had affidavits from friends and family as to his emotional distress. Utilizing the middle ground of *Zean*, Meyer has pointed out no other evidence of her emotional distress than her "humiliation" over having to repeat her story and not being believed. (Licup Aff., Ex. A at 133:4–6, Docket No. 26.) Under the more lenient standard of *Edeh*, that characterizes emotional distress as "highly subjective," Meyer's evidence would suffice. As a result, while the Court is skeptical about this portion of Meyer's claim, the Court finds that the emotional distress Meyer has alleged is sufficient to survive summary judgment.

### C. Punitive Damages

The fact that the Court views Meyer's claims for actual damages based on her emotional distress with some skepticism does not mean she is barred from recovering statutory or punitive damages. "In the absence of actual damages, [Meyer] can still recover punitive and statutory damages under [the FRCA]." *Graham v. CSC Credit Servs., Inc.*, 306 F. Supp. 2d 873, 879 (D. Minn. 2004). However, under the FRCA, to obtain punitive damages Meyer's claim must meet a higher standard to demonstrate a right to such damages: she must "show that the defendant 'willfully fail[ed] to comply'

with the FCRA." *Id.* (alteration in original). Willful noncompliance with the FRCA requires a showing of "reckless disregard" – a standard that is lower than a "knowing violation" yet higher than the "negligence" standard for actual damages. *Safeco Ins. Co. of Am. v. Burr et al.*, 551 U.S. 47, 57–59 (2007). Reckless conduct includes actions that entail "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68.

Here, FIA argues that there is no evidence it took any risk of violating the statute, let alone an unjustifiably high risk" since its investigation was reasonable and stemmed from standard internal procedures. However, Meyer's evidence could support a jury finding that the investigation was not reasonable. For example, the CRA asked FIA to compare signatures on the convenience checks and it did not do so. (Licup Aff., Ex. E, FIA-MEYER000015, Docket No. 26.) Further, Meyer presents evidence that the investigation initially done by FIA was simply the determination by the initial customer service representative taking her call and that the manager of the fraud department laughed at her and called her a liar. (*Id.*, Ex. A at 93:16–17.) A jury could find that these actions constitute "reckless disregard" for Meyer's rights under the FRCA. As a result, the Court finds that there are material facts in dispute precluding summary judgment for FIA on the punitive damages claim. *See Anderson*, 477 U.S. at 248.

In sum, the Court finds that there exist disputes of material facts on the questions of whether FIA conducted a reasonable investigation and whether Meyer sustained actual and punitive damages.

This case will be placed on the Court's next available trial calendar.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendant F.I.A. Card Services, N.A.'s motion for summary judgment [Docket No. 23] is **DENIED**.

DATED: February 1, 2011            ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                            United States District Judge